Good morning, Counselor. We have four appeals to hear this morning. We're familiar with your cases. We've read your briefs, authority cited in your briefs, and looked at at least portions of the record, so you don't have a lot of time this morning. Feel free to get straight to the heart of your argument. We're probably going to have some questions this morning, but be mindful of our traffic lights. If the red light shines, it is time to wrap it up. If you're answering a question from the court, of course, you'll be on our time. We're going to begin this morning with United States v. Wasserman, Mr. Sansone. My name is Bill Sansone, and I represent Mr. Wasserman in this appeal. During the three-day testimony of the only co-defendant, Mr. Kenneth Rossman, neither Mr. Wasserman nor the jury who convicted Mr. Wasserman knew the following information. The co-defendant was mentally ill during the time of his offense conduct. He had untreated bipolar disorder, which affected his judgment, his decision-making ability, and his ability to perceive events. During the trial testimony, he was taking anti-psychotic medications that greatly assisted his ability to think clearly and act more appropriately. So the jury saw during trial a mentally more stable man than the man who was working with Mr. Wasserman as a co-defendant in this fast life insurance case. Mr. Rossman's offense conduct, as he admitted in sentencing, was driven by his mental health issue. And that's very important because in the briefs and in the record, there's a lot of discussion about the materiality of Mr. Rossman, the co-defendant's mental health issue, and its impact not having that information before the jury. But this is a man, the co-defendant, who begged the district court for leniency at sentencing, stating that his untreated mental illness drove his offense at all. Now, Mr. Wasserman had, in pre-trial, of course, Rossman's, there's nothing to prevent the defense from asking Rossman about his memory. In fact, did ask him about his memory. And his testimony was amply corroborated by other evidence, wasn't it? Well, I'll answer your first question, Your Honor. Yes. But in this case, in pre-trial litigation, we actually moved for the co-defendant to sit for a psychiatrist exam because we thought he was mentally unstable. The United States... Wasserman knew that, of course. Pardon me? Wasserman knew all of that, of course. He suspected. There was no, he had no... No, no, what I mean is when the motion was made... That's what we thought. Wasserman could do all sorts of inquiries. How long had he known this chap? He had known him, I think, for about 20 years. About 20 years. Well, and he was bipolar, which means it was on a roller coaster. Rossman was not diagnosed with bipolar until after this indictment. No, but I mean... But he suffered from bipolar. He suffered from it. Well, here's the issue. When we moved to have him sit for a psychiatrist exam and see if he had any mental health issues, the United States told the government there was absolutely no evidence that he had any mental health issues, and we were told by Rossman's attorney to go listen to his change of plea colloquy, where he actually answered under oath that he had no mental health issues. So then at trial, we had no good faith basis to start going into suspected mental health issues where we were told there were none, and we were actually accused of witness intimidation for even filing the motion. But after that motion, I'm not saying the government was being disingenuous at that time, but after that motion was filed, and prior to the trial, the government learned that the statements that it made to this court and to Mr. Wasserman were no longer true. They knew that. They knew he had been diagnosed with mental illness. They knew he was on powerful anti-psychotic medications, and they knew that those medications were making him more stable than he was at the time. So the district court, it seems, agreed with you on three out of your four elements for the Brady violation, and let's say, and speaking just for myself, that I agree with the district court's rulings as to those three elements. The challenge is the fourth element. As you started out, you had Rossman on the stand for three days out of a six-week trial with a lot of documentary evidence against your client. How do you overcome the ruling on the fourth element? Well, the fourth element is that had the evidence been disclosed to the defendant, there would have been a reasonable probability the outcome would have been different. One is the district court said it wasn't material. It didn't rise to being material, and it goes back to what Judge Pryor said about a plethora of other evidence. But there's only, as to the conspiracy charge, there was only one co-conspirator. All of the evidence as a plan that these two gentlemen had entered into to defraud the investors flowed through Rossman, the co-defendant. And he was so critically important, that's why the government specifically mentioned him by name, not just he, and he said by name 57 times in their closing argument. And the district court said any questions that we would have asked the co-defendant would have been cumulative. The jury heard absolutely nothing about his mental health issues. There were some issues as to his memory, but not that he was suffering from a bipolar disorder that he admitted to the district court later drove his offense conduct. And also, Judge Abudu, a different outcome doesn't equal an acquittal. If the jury had heard this information, is there a reasonable probability that one juror would have changed their mind about Kenneth Rossman and the plan, because he's the only co-defendant, the plan to defraud these investors? Because if one juror changed their mind, would have been a mistrial, which is a completely different result. So that's how I assess that. And back to Judge Pryor, yes, we do. Y'all knew about his, the defense knew about his risky behavior, they knew about his memory issues, and asked about it, and asked about it. We did. Nothing would have prevented him from asking about his mental health treatment. Well, the difference, Your Honor, and I normally would agree with you, in pretrial litigation, we were blasted for even filing it. We were specifically told that this man had said under oath to the district court judge he had no mental health issues. And you're telling me that the district court would have not allowed you on cross-examination to ask whether he suffered from any mental illness? We had no... I don't see the basis for saying that the district court wouldn't have allowed that. There was no good faith basis to ask the question, because we were directed to his changeth plea, where he said under oath, I have absolutely no mental health issue, period. So to start trying to raise that at trial, we felt we didn't have a good faith basis to ask. But on redirect examination, the United States says, did you tell them, the Fast Life investors, during this period, what was happening with Fast Life? The answer was, I think I started to tell them Fast Life was in trouble. I believe that was about the time I was slanting, I'm not sure what that means, everything out. It was Letigar, Hutchins, those are investors, whomever. I wasn't really mentally with it at the time because I was in so much pain. That's absolutely false. He was not mentally with it at the time, and the government knew this at the time of the trial, and so did he, Rossman, that he was mentally ill. He didn't know about his mental illness. It drove his offense conduct, and at the time of trial, he's taking anti-psychotic medications. So for him to say the only reason I was not mentally with it is because I was in so much pain is one, either absolutely false, or as this court, as the Fifth Circuit said in the United States seat, Anderson, the government, a false statement either goes uncorrected or allows the jury to present it with a material false impression. Okay, thank you. I think we understand it. Ms. Gershaw. Good morning, your honors, and may it please the court. On behalf of the United States, after hearing from Washman's expert on bipolar disorder, Rossman's counsel, Rossman, and the prosecutor, the district court determined that the nondisclosure of Rossman's diagnosis met the first three prongs of a Brady violation, but it was not material. The district court was in the best position to make that determination, having presided over Washman's 30-day fraud trial. This determination is entitled to deference. As the district court found, Rossman's diagnosis was not material because, one, Rossman's testimony was extensively corroborated by documents and other evidence on the agreement and how the scheme worked. Two, the defense had already attacked the same credibility themes, memory and high-risk behavior, so this would be cumulative impeachment. And three, there is no record evidence that the bipolar disorder actually impaired Rossman's perception or memory of the relevant events. And that is why the district court determined that this did not undermine its confidence in the jury's verdict. He says that, my friend says that they would have had a different impression of Rossman if they, if the jury The jury would have had Right, if they knew that Rossman was mentally, was mentally ill. But the jury already had the impression of Rossman that he was erratic, that he had been duped into two romance fraud schemes involving gold bars. They knew that he had lied to the IRS agent when he was initially asked about this. So just having the label that this action, that these actions were driven by bipolar disorder as opposed to him just being an erratic person wouldn't change the impression of Rossman in the least. And certainly not enough to undermine confidence in the jury's verdict given the corroborating evidence. In terms of his claim that the United States said it would be witness intimidation to ask about his bipolar diagnosis, that's not what the United States said. What the United States said is at the very beginning when he asked for Rossman to sit for a psychiatric examination, which is way more intensive than just being asked, have you been diagnosed with a mental disorder? That's what the prosecutor was saying would be witness intimidation. If any witness would have to be subject to a psychological examination just because the defendant thought that he might have psychological issues. Well, that instinct turned out to be correct though. It did turn out to be somewhat correct, Your Honor, but his basis for the psychiatric examination related to the car accident, he said he suffered this car accident and that's affecting his memory and his competency. And that is not the same as the bipolar disorder. And again, even if he did turn out, it did turn out to be correct, it doesn't mean that the prosecutor was engaging in witness intimidation or that he couldn't have asked about that at trial. Now his statement about— And just to be clear, I mean, again, you lost on the first three elements of the Brady claim, but what then would have been, to their point, the foundation to inquire, go down that route? The foundation for them to inquire and go down that route would be that they suspected that he had a mental illness. But again— And that suspicion, I mean, I think this is an important point because it could be as below the government ended up being successful on the fourth prong, but the fact that the court found against you as to the other three I think is very significant. And for litigants moving forward in this situation, what would be the basis for even that suspicion if they don't have the information that the government admittedly possessed? Your Honor, let me be clear. We're not challenging the district court's determination on the first three prongs. We are simply arguing that the district court didn't abuse its discretion on the fourth prong when it said that this would not undermine confidence in the jury's verdict. I understand that. I'm sorry, I thought you were going into the realm of one of the other elements in terms of this idea that they could have nevertheless inquired into this line of discussion if they didn't have a foundation. They were trying to access the foundation, which they weren't able to and found out after the fact. But if that is something you're abandoning or not addressing, then that concession I accept. We are only—the district court made a finding. The finding was on four prongs, on the three prongs. Whether or not we would necessarily agree with it, we are not challenging it. Let me make sure I understand what I thought you were saying earlier. And this is something I thought the district court said as well. The first three parts of the Brady test have been satisfied. Whether there's a reasonable probability of a different outcome, whether there's something that undermines confidence in the jury's verdict, the fourth part of the test is important. It not only is a judgment that depends on all the corroborating evidence that supports his testimony, but it's also affected by what the defense asked him on cross-examination about his memory, because they knew he had memory problems, about his erratic behavior, because they knew he had erratic behavior. And that's part of the mix about whether knowing additionally that he was bipolar and receiving mental health treatment for being bipolar, right? Yes. Medication, I take it? Yes. For being bipolar, right? Yes. All of which would actually support confidence, perhaps, in his testimony. Correct. The jury's told that, too. The jury's told, yeah, he's been diagnosed bipolar, and he's getting treatment for it. That's a reason why the jury might actually believe him more. Correct, Your Honor. Isn't that right? Correct, Your Honor. And I would also point out that, again, a large portion of Rossman's testimony, his credibility didn't really matter because it was just testifying, this document says this, this email says this. It was actually, although they want to make Rossman out as the star witness in the case, the star witness in this case was the documents that showed Rossman's participation. Well, and best are victims. Yes. Their testimony, right? Exactly. And what they say Rossman told them is what Rossman testified to as well. Correct. And the majority of the uncorroborated testimony that Rossman gave was helpful to Rossman. He said, these victims were my friends and long-term clients. I never would have intended to defraud them. I thought fast life was a good idea when I started out. I thought this was a great idea. It was my, I was going to make millions off of this. All of that testimony is helpful to Rossman. I mean, obviously it didn't carry the day, but undermining his credibility at this point would have really undermined his credibility on points that were helpful to Rossman because everything else was corroborated. Unless the court has any questions, I'd ask you to affirm the district court. Thank you, your honors. Thank you.  Mr. Santoni? Yes. Thank you. Again, may it please the court. Thank you. Counsel. Yes, sir. Was the jury told what bipolar is and how it manifests itself? The jury never heard the word bipolar. I understand that. It wasn't, but the defense knew about the bipolar. Not at the time of the jury trial. They didn't know they had bipolar. We learned about it when I read Rossman's sentencing memorandum after Wasserman had been convicted. After the trial. That's when we learned it, and the judge actually set a full-day evidentiary hearing on our motion for new trial, and Mr. Wasserman did engage an expert witness on bipolar. The problem with his testimony is we actually moved the district court for Rossman's medical records because we knew materiality was going to be a big issue. The district court denied us access to his medical records before the evidentiary hearing, and the district court did not review those medical records in camera. So during the evidentiary hearing on the motion for new trial, one of the things Judge Honeywell said in her opinion was Dr. Ballinger's testimony wasn't specific as to the co-defendant. Well, we were denied access to all his records, and our expert was denied access to the records. Now, the expert did say one of the things about bipolar that the jury should have known about is when you have a bipolar person who's taking medications, the jury needs to hear their ability to remember events when they're untreated. There's an issue with that. So him testifying— Yeah, but the problem, as I see it, that you have is just what Judge Honeywell found, which is that he didn't have a problem remembering. His memory from his testimony and from all the other evidence was fine. That's the problem for your client. Well, a lot of the issue, Your Honor, $6 million was raised by investors. Rossman raised $5 million of those dollars himself. Most of the investors' sole discussions were with Rossman. And they testified about how they were duped by him in a way that was totally consistent with his testimony, which shows no memory problems. That's the point of Judge Honeywell's finding. But to establish the plan, Rossman had to link Phil Wasserman. These investors never heard that. The guy that's talking to him never talked to Philip Wasserman about this. He lied to them about investing on his own. Wasserman had no idea about that. They never spoke with Philip Wasserman. So at that time— Didn't the bank records also corroborate his testimony that he didn't have access to the bank accounts? Yes, he did. Who did? Wasserman. $10 million came in to Fast Life. $6 million—these are the government's numbers—$6 million was raised by investors. Mr. Wasserman spent $8 million, $2 million more than all the investor money raised, into the company. That's on the government's numbers. But I do want to read a line from this court's decision in Lindstrom, which played a big part. This court, when the defendant did not get the medical records and information about the witnesses' mental health, this court focused on the jury and said,  the jury was denied evidence necessary for it to make an informed determination of whether the witness's testimony was based on historical facts, how she perceived, or whether it was the product of some psychological hallucinations. Now, this jury was denied access, and our cross-examination could have been different as to all of the investors who testified if they learned that the person they were dealing with, because they didn't deal with Mr. Wasserman at all, was mentally ill, he was lying to them, how that would have affected their testimony. He was lying to them. I mean, they testified that he was lying to them, and he testified that he lied to them. But the jury had to make a determination about whether Rossman was credible enough to establish that he had entered into a plan to defraud the investments with Mr. Wasserman, and our position is that this evidence could have changed at least one juror's mind. Well, thank you, Mr. Sansoni. We understand your argument. I note that you were court-appointed, and we really appreciate you accepting the appointment and discharging your responsibility today. Thank you very much, Your Honors. We're going to move on to our second case. I think it's the jury. Okay.